Craig **HEGNA**; Steven Hegna; Lynn Hegna; Paul Hegna; Edwena Hegna, Plaintiffs–Appellants,

v.

THE ISLAMIC REPUBLIC OF IRAN; The Iranian Ministry Of Information And Security, Defendants–Appellees,

and

United States Of America, Movant–Appellee.

No. 03–2159.

United States Court of Appeals, Fourth Circuit.

Argued: May 4, 2004.

Decided: July 14, 2004.

**ARGUED:** Ralph P. Dupont, Dupont & Radlauer, Stamford, Connecticut, for Appellants. Lewis Stanley Yelin, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Appellees. **ON BRIEF:** Robert B. Kershaw, Ward, Kershaw & Minton, P.A., Baltimore, Maryland; Barbara J. Radlauer, Dupont & Radlauer, Stamford, Connecticut, for Appellants. Barbara C. Hammerle, Chief, Foreign Assets Control, Office of the General, United States Department of the Treasury, Washington, D.C.; Mark A. Clodfelter, Lisa J. Grosh, Attorney–Advisers, Office of the Legal Adviser, United States Department of State, Washington, D.C.; Peter D. Keisler, Assistant Attorney General, Thomas M. DiBiagio, United States Attorney, Gregory G. Katsas, Deputy Assistant Attorney General, Douglas N. Letter, H. Thomas Byron, III, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Appellees.

Before LUTTIG and MICHAEL, Circuit Judges, and Bobby R. BALDOCK, Senior Circuit Judge of the United States Court of

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge MICHAEL and Senior Judge BALDOCK joined.

## OPINION

LUTTIG, Circuit Judge:

Appellants, the Hegna family, are judgment-creditors of the Islamic Republic of Iran ("Iran"). Invoking section 201(a) of the newly-enacted Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub.L. No. 107–297, § 201(a), 116 Stat. 2,322, 2,337 (codified at 28 U.S.C. § 1610 note), the Hegnas attempted to enforce their judgment against Iran by obtaining writs of attachment in aid of execution on two Iranian-owned properties in Bethesda, Maryland. Due to the severance of diplomatic relations between Iran and the United States, both properties are currently in the possession of the United States government. At the motion of the United States, the district court quashed both writs of attachment, on the ground that the properties were not "blocked assets" as that term is defined in section 201(d)(2) of TRIA and, therefore, not subject to execution or attachment under the Act.

We affirm, though for different reasons than those relied upon by the district court. Regardless of whether the Bethesda properties are subject to execution or attachment under TRIA, we hold that, by accepting a compensatory payment under section 2002 of the Victims of Trafficking and Violence Protection Act of 2000 ("Victims Protection Act"), Pub.L. No. 106–386,

§ 2002, 114 Stat. 1,464, 1,541, the Hegnas have relinquished their rights to effect the sale of the properties in satisfaction of their judgment. *See* Victims Protection Act § 2002(d)(5) (as amended by TRIA § 201(c)(4)). Accordingly, the writs of attachment in aid of execution levied on the Bethesda properties must be quashed.

## I.

On or about December 4, 1984, Charles Hegna was murdered by members of Hezbollah, a terrorist organization with ties to the Islamic Republic of Iran ("Iran"), during that organization's hijacking of a Kuwaiti Airlines passenger airplane over the Gulf of Oman.

Until 1996, Hegna's wife and children—the appellants in this case—were barred by the Foreign Sovereign Immunities Act (FSIA) from bringing suit against Iran for its role in his murder. *See* 28 U.S.C. § 1604 (providing that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," except as expressly provided in subsequent provisions of the FSIA). In that year, however, as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Congress amended the FSIA to allow victims of terrorism to sue countries that have been designated state sponsors of terrorism by the State Department, like Iran, for those countries' provision of "material support" for terrorist acts. *See* 28 U.S.C. § 1605(a)(7). The Hegna family took advantage of this exception to Iran's immunity from suit, and, on April 3, 2000, brought suit in federal court against Iran and its agent, the Iranian Ministry of Information and Security (MOIS), for their complicity in Charles Hegna's murder. Iran did not appear to defend itself in this action. In February 2002, the Hegnas obtained a default judgment of $42,000,000 in compensatory damages against Iran and the MOIS and $333,000,000 in punitive damages against the MOIS alone. *Hegna v. Islamic Republic of Iran*, No. 1:00CV00716 (D.D.C. Feb. 7, 2002) (amended order and judgment); J.A. 5–6.

Congress has devised two avenues by which individuals like the Hegnas—successful plaintiffs in suits brought under section 1605(a)(7)'s exception to sovereign immunity—may satisfy their judgments against state sponsors of terrorism. First, Congress has subjected an increasingly broad class of property owned by these nations in the United States to execution and attachment in aid of execution. Congress' latest effort in this regard is embodied in section 201(a) of the TRIA, 28 U.S.C. § 1610 note. Section 201(a) states:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, the blocked assets of that terrorist party ... shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610 note.

Second, in the Victims Protection Act, Congress directed the Secretary of the Treasury to make direct payments to certain judgment-creditors of Iran and Cuba from funds belonging to those nations but being held by the United States government. *See* Victims Protection Act § 2002. As first enacted, the group of individuals eligible to receive these payments under the Act was relatively small and, with five specific exceptions, did not include individuals, such as the Hegnas, who obtained their judgments after July 20, 2000. *See*

Victims Protection Act, Pub.L. No. 106–386, § 2002(a)(2)(A), 114 Stat. 1,464, 1,542 (2002), *amended by* TRIA § 201(c)(1). Payments under the Act were not designed merely to supplement the plaintiffs' recoveries on their judgments, but rather to replace them. The initial payments authorized by the VPA were equal to the amount of compensatory damages awarded in judgments, and the VPA required the recipients of those payments to relinquish both their "rights and claims" to compensatory damages and, depending on the size of the payment the recipient elected to receive, either their rights to punitive damages or their rights "to execute against or attach" certain properties owned by Iran or Cuba, respectively, in satisfaction of those damages. Victims Protection Act § 2002(a)(2)(B)-(D).

The Victims Protection Act was amended substantially in November 2002 by section 201(c) of TRIA. *See* TRIA § 201(c), 116 Stat. 2,322, 2,337–39. First, section 201 of TRIA expanded the group of judgment holders eligible for payments to include persons, like the Hegnas, who filed suit against Iran before October 28, 2000. *See* TRIA § 201(c)(1) (amending Victims Protection Act § 2002(a)(2)(A)(ii)). Second, in anticipation that the funds designated for payments under the Victims Protection Act would not be sufficient to provide the newly-eligible judgment creditors with a payment in the full amount of their compensatory damages, the 2002 amendments directed the Secretary to dis-

tribute the remaining funds to qualified judgment holders on a pro-rata basis, based on the size of their respective compensatory damage awards. TRIA § 201(c)(4) (amending Victims Protection Act § 2002(d)). Finally, because these pro-rata payments were likely to be substantially smaller than the full amount of compensatory damages, the amendments no longer required recipients of payments under the Act to relinquish their rights to pursue compensatory damages; however, the Act did require them to forego their "rights and claims" to punitive damages, as well as "all rights to execute against or attach property that is at issue in claims against the United States before an international claims tribunal." TRIA § 201(c)(4) (amending Victims Protection Act § 2002(d)(5)).

■ In this case, the Hegna family attempted to satisfy their judgment against Iran by pursuing both avenues of recovery. The Hegnas first sought to recover on their judgment through the execution of Iranian properties located in the United States. Relying on the rights given them by section 201(a) of TRIA, the Hegnas obtained writs of attachment upon judgment from the district court in the district of Maryland on two Bethesda, Maryland properties owned by Iran and in the possession of the United States.[1] J.A. 11–12 (district court order of December 27, 2002 issuing writs of attachment on both properties). Pursuant to these writs of attach-

---

1. The Bethesda properties were used as residences by diplomatic employees of the Iranian embassy until April 7, 1980, when President Carter severed diplomatic relations with Iran and ejected all of its diplomatic and consular employees from the country in response to the refusal of the government of Iran to end the detention of the United States diplomatic and consular staff at the American Embassy in Tehran, Iran. J.A. 28 (Declaration

of Francis X. Taylor, Asst. Secretary of State for Diplomatic Security). Since that time, the properties have been held in the custody of the United States government pursuant to the United States' obligation, under section 45 of the Vienna Convention on Diplomatic Relations, to "respect and protect" the premises of a foreign mission when diplomatic relations between a "receiving state" and a "sending state" are severed. J.A. 29–30.

ment, a United States marshal levied[2] on the Bethesda properties on May 28, 2003, and formally executed the writs by filing a return with the clerk's office on June 3, 2003, J.A. 2. *Butler v. Tilghman,* 350 Md. 259, 711 A.2d 859, 864–65 (1998). The district court quashed the writs at the motion of the United States on August 25, 2003, on the ground that the Bethesda properties were not "blocked assets" under TRIA—and therefore not subject to attachment under the Act—because the properties were "being used exclusively for diplomatic ... purposes," TRIA § 201(d)(2)(B)(ii). *Hegna v. Islamic Republic of Iran,* 287 F.Supp.2d 608, 610 (D.Md.2003).

The Hegnas were not willing to rest on the execution of the Bethesda properties alone, however. In July 2003—before the district court quashed the writs of attachment but after a marshal levied on the Bethesda properties—the Hegnas accepted a pro-rata payment from the United States treasury (represented by the government at argument to exceed $8,000,000) under the Victims Protection Act. *See* Victims Protection Act § 2002(d)(1)(A) (as amended by TRIA § 201(c)(4)). As required by statute, by their receipt of the pro-rata payment, the Hegnas relinquished, "all rights and claims to punitive damages awarded in connection with" their judgment and, of critical relevance here,

"all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal." *See* Victims Protection Act § 2002(d)(5)(B) (as amended by TRIA § 201(c)(4)) (emphasis added); *Hegna v. Islamic Republic of Iran,* 299 F.Supp.2d 229, 230 (S.D.N.Y.2004).

## II.

 In this appeal, the Hegnas challenge the district court's order quashing the writs of attachment on the Bethesda properties. We affirm the district court's order without deciding whether the district court erred in holding that the two Bethesda properties are not "blocked assets" under section 201(d)(2)(B)(ii) of TRIA. Even assuming the Bethesda properties are "blocked assets" and therefore subject to execution and attachment in aid of such execution under TRIA, we conclude that the properties may not be executed against or attached *by the Hegnas* because the Hegnas have relinquished any right they previously possessed to force the sale of the Bethesda properties in satisfaction of their judgment.[3]

 The Hegnas vigorously resist this conclusion. First and foremost, they argue that their relinquishment has no application to the judicial sale of the Bethesda properties because, at the time

---

**2.** A marshal "levies" on real estate by "going to the property and delivering the notice" contained in the underlying writ. *Helinski v. Harford Memorial Hosp., Inc.,* 376 Md. 606, 831 A.2d 40, 48 (2003); Md. Rule § 3–642 (providing that a "sheriff shall levy on a judgment debtor's real interest in property pursuant to a writ of execution by entering a description of the property on a schedule and posting a copy of the writ and the schedule in a prominent place on the property").

**3.** The Hegnas object to our consideration of the effect of their relinquishment of rights under section 2002(d) of the Victims Protec-

tion Act, on the ground that the issue was not raised before the district court. This objection may be easily dismissed. The record makes clear that the United States raised the issue of the Hegnas' relinquishment before the district court in a supplemental memorandum, filed August 14, 2003. Supplemental Appendix at 2. We are therefore entitled to affirm the district court's judgment on that alternative ground. *MM ex rel. DM v. School Dist. of Greenville Cty.,* 303 F.3d 523, 536 (4th Cir.2002); *Cochran v. Morris,* 73 F.3d 1310, 1315 (4th Cir.1996).

of the relinquishment, the marshal had already levied on the Bethesda properties.[4] After a levy, the Hegnas argue, a property is formally "attached" and, as a consequence, placed "in custodia legis" (in the custody of the court). Thereafter, in the Hegnas' view, the judgment creditor has no rights of execution or attachment remaining, prior to the judicial sale of the property in satisfaction of his judgment.

We cannot agree. By their receipt of a payment from the United States treasury, the Hegnas relinquished "*all* rights to execute against or attach" certain properties. *See* Victims Protection Act § 2002(d)(5) (as amended by TRIA § 201(c)). These rights include not only the rights that the Hegnas had already exercised at the time of relinquishment, the rights to obtain a writ of attachment on judgment and to have a marshal levy against the property under that writ, but also rights of "execution" that the Hegnas had not yet exercised, such as the rights to proceed under that writ of attachment on judgment and, eventually, to have the property sold by the marshals and to receive the proceeds of that sale. *See* Thomas D. Crandall *et al.*, 1 *The Law of Debtors and Creditors* § 6:50 (2004) (explaining that "the final step of the execution process involves the sale of the property levied upon"). Thus, while the marshal's levy on the Bethesda properties represented an important step in the Hegnas' execution of those properties, it did not exhaust the Hegnas' bundle of rights "to execute against" the properties because it did not complete the sale of the properties in satisfaction of the Hegnas' judgment.

The procedures that govern both the execution of judgments, and the processes in aid of execution, such as the writ of attachment on judgment issued by the district court in this case, are dictated by the state in which the district court is located. Fed.R.Civ.P. 69. Hence, the determination of whether, at the time of relinquishment, further execution against the Bethesda properties was necessary to satisfy the Hegnas' judgment turns on Maryland law.

Under Maryland law, an attachment on judgment is a form of execution, allowing "a judgment creditor [to] reach the assets of a judgment debtor in the hands of a third party." *Northwestern National Ins. Co. v. William G. Wetherall, Inc.*, 267 Md. 378, 298 A.2d 1, 5 (1972); *Steed Mortgage Co. v. Arthur*, 37 Md.App. 592, 378 A.2d 690, 694 (1977); *see* Md. Code, Cts. & Jud. Proc. § 3–301(a) (authorizing the issuance of "an attachment on a judgment or decree in lieu of any other execution"). A marshal's levy on a property pursuant to a writ of attachment on judgment formally "attaches" the properties for the purpose of satisfying a judgment. *See Butler*, 711 A.2d at 864–65 (providing that a writ of attachment is executed on the date a marshal or sheriff files a return with the clerk's office); *cf. Helinski*, 831 A.2d at 48 (describing the effect that a levy has on a writ of execution). As noted, this is a critical step in the eventual execution of the property. The post-judgment attachment of a property establishes an inchoate lien on a property and provides notice to those individu-

---

**4.** The Hegnas wrongly assert that the effective date of the attachment was May 28, 2003, when the marshal physically levied on the Bethesda properties. Appellant's Reply Br. at 9. This is technically inaccurate. Under Maryland law, a writ of attachment is not legally executed until the marshal files a return on the writ with the clerk's office. *Butler v. Tilghman*, 350 Md. 259, 711 A.2d 859, 864–65 (1998); Md. R. Civ. P. 3–642(d). Thus, in this case, the writs of attachment were executed on June 3, 2003. J.A. 2 (providing that the marshal filed returns on both properties on that date).

als currently in possession of the property that the judgment creditor who caused the writ to be issued intends to have the property sold, putting that person on notice not to dispose of the property. *Fico, Inc. v. Ghingher,* 287 Md. 150, 411 A.2d 430, 437 (1980) (explaining that, "until judgment of condemnation absolute, the attachment serves the useful function of preventing the garnishee from prematurely disposing of any of the judgment debtor's assets"). Moreover, the levy of a writ of attachment on judgment instigates proceedings by which the individual then in possession of the property may appear and challenge the judgment creditor's claim to the property. *See Northwestern,* 298 A.2d at 7 (providing that, upon the attachment of a property, the "garnishee is [ ] entitled to a hearing as to his contention that a part or all of the assets he has are not subject to condemnation in favor of the executing judgment creditor").

 Standing alone, however, the levy of a writ of attachment upon judgment on a property is not sufficient to cause the property to be sold by a marshal in satisfaction of the judgment. To effect the actual sale of the property, the judgment creditor must, at the very least, obtain a judgment of condemnation absolute or a writ of execution with respect to the subject property.[5] *See id.* at 5–7 (providing that proceedings begun by a writ of attachment on judgment culminate in a judgment of absolute condemnation); Md. Code, Cts. & Jud. Proc. § 11–501 (stating that, "[a] sheriff or constable to whom any writ of execution is directed may seize and sell the legal or equitable interest of the

defendant named in the writ in real or personal property"). After a marshal has levied a writ of attachment on judgment on a property, the eventual sale of the property in satisfaction of the judgment is by no means assured. To obtain a judgment of condemnation absolute, the judgment creditor must demonstrate, among other things, the amount of the judgment debtor's assets in the hands of the garnishee, *see Steed Mortgage,* 378 A.2d at 694 (requiring such a showing even where the garnishee did not appear to contest the judgment debtor's interest in the property), and show that his interest is superior to the interests of other creditors in the property, *Northwestern,* 298 A.2d at 7–8. Similarly, after a writ of execution has been issued and levied on a property, the sale of the property is not automatic: a judgment creditor must proceed diligently to cause the property to be sold in a reasonable time, *see, e.g., W.D. Curran and Assoc., Inc. v. Cheng–Shum Enterprises, Inc.,* 107 Md.App. 373, 667 A.2d 1013, 1022 (1995); *Joshi v. Kaplan, Freeland, Schwartz & Bloomberg, P.C.,* 72 Md. App. 694, 532 A.2d 712, 714–15 (1987), and the marshal must give prior, public notice of his intention to do so. Md.Code, Cts. & Jud. Proc. § 11–502. Indeed, at any time until the sale of the property, a judgment debtor may intervene to have the property released from the levy. Md. Rule § 2–643(c).

In sum, at any point until the marshal's sale of a property, we conclude that, under Maryland law, the judgment creditor can be said to possess rights "to execute

---

**5.** The district court's order directing the issuance of writs of attachment on the Bethesda properties envisioned precisely this process. Though the court's order directed the clerk to issue writs of attachment on the Bethesda properties forthwith and directed the marshal to levy on the properties by posting a copy of

each attachment upon the premises, it provided the defendants with 60 days *after* the service of the writs of attachment to appear and "show cause why a Judgment of Condemnation or a Writ of Execution as to the attached property should not be entered." J.A. 11–12.

against" the property. Yet, at the time the Hegnas relinquished their existing rights "to execute against" the Bethesda properties, they had not undertaken the final stage of execution by securing either a judgment of condemnation absolute or a writ of execution on the properties. We hold that their relinquishment bars them from proceeding with any effort to do so now.

Accordingly, so long as the Bethesda properties are within the scope of the relinquishment and the Hegnas have received a payment from the Treasury sufficient to trigger their relinquishment, their relinquishment of rights requires that the writs of attachment executed on the properties be quashed. We address these issues in turn.

■■■ The Hegnas' relinquishment of rights did not extend to all Iranian properties in the United States, but only to those "at issue in claims against the United States before an international tribunal." Thus, we must determine whether the Bethesda properties fall within this class of properties. We have no difficulty deciding that they do. In 1982, Iran filed claims against the United States in the Iran–U.S. Claims Tribunal ("Claims Tribunal") alleging that the "United States has breached its obligations under the Algiers Declarations by failing to grant Iran custody of its diplomatic and consular properties in the United States." *See Islamic Republic of Iran v. United States of America,* No. DEC129–A4/A7/A15 (I:F & III), 33 Iran–U.S. Cl. Tr. Rep. 362 ¶ 1 (1997). The Bethesda properties are former Iranian diplomatic properties, J.A. 35 (declaration of Francis X. Taylor), and, therefore, "at issue" in these claims. The Claims Tribunal has postponed hearing on Iran's claims in order to allow the two nations to settle their dispute, but, as the Hegnas concede, the claims remain pending before the tri-

bunal. Thus, it would appear rather straightforward that the Bethesda properties fall within the contours of the Hegnas' relinquishment.

The Hegnas argue, nevertheless, that the Bethesda properties are not "at issue ... before" the Iran–U.S. Claims Tribunal because it has not yet been established that the tribunal has "subject matter jurisdiction" over the claims. As an initial matter, the Hegnas have offered no evidence to support their claim that the United States contests the jurisdiction of the Claims Tribunal to consider Iran's claims, and the decisions rendered by the Claims Tribunal thus far fail to so much as hint that its jurisdiction has been challenged. To the contrary, the Claims Tribunal has provided that, "[t]he final determination of the rights to [the diplomatic and consular properties] will be made in due course, either by the Parties themselves in the settlement process or *by the Tribunal if the Parties fail to reach a settlement." Id.* at ¶ 10; *see also id.* at ¶ 12 (explaining that the "Tribunal's jurisdiction to determine these claims will not be prejudiced if [Iran's] present request is not granted"). In any event, even if the jurisdiction of the Claims Tribunal to hear Iran's claims regarding its diplomatic and consular properties in the United States was in dispute and yet undecided, the Hegnas' argument could still not be sustained. The Claims Tribunal's consideration of its jurisdiction would not change the fact that the Bethesda properties are "at issue" in Iran's claims, nor would it mean that Iran's claims are no longer "before" the Iran–U.S. Claims Tribunal. As was recently explained in rejection of an identical argument, "a jurisdictional issue is still an issue, and until and unless the Tribunal determines it lacks jurisdiction over Iran's claim to the property, the property is 'at issue' before the Tribunal." *Hegna v. Is-*

*lamic Republic of Iran,* 299 F.Supp.2d 229, 230 (S.D.N.Y.2004).

█ Finally, the Hegnas argue that section 2002(d)(5) of the Victims Protection Act does not require them to relinquish their rights until they have received the full amount to which they are entitled under section 2002(d)(1) of the Act. This argument too is unavailing. Section 2002(d)(5) states that, *"any persons receiving less than the full amount of compensatory damages awarded to that party in a judgment* ... shall be required to relinquish rights set forth" in sections 2002(a)(2)(C) and (D). Victims Protection Act § 2002(d)(5). We see no reason to read this statutory provision to mean anything other than what it says: whenever an eligible judgment creditor of either Iran or Cuba receives a payment of "less than the full amount of compensatory damages" from the Treasury under section 2002(d), he must relinquish the rights described in the Act. It is uncontested that the Hegnas have received such a payment here, and, therefore, by operation of statute, they have relinquished their rights to punitive damages and "to execute against or attach" certain properties. *Accord Hegna,* 299 F.Supp.2d at 230. It may be that the Hegnas ultimately are entitled to more under the Victims Protection Act than they have received thus far (the record is barren on this account), but, even assuming that they are, such a grievance does not provide a defense to the relinquishment effected by their receipt of a smaller payment.

### III.

In summary, by their receipt of a payment "less than the full amount of [their] compensatory damages award," the Hegnas relinquished "all rights to execute against or attach" the Bethesda properties, on which they had caused a writ of attach-

ment on judgment to be levied. We hold that their relinquishment prohibits them from taking the additional steps necessary to complete the execution of the properties in satisfaction of their judgment against Iran. The order of the district court quashing the Hegnas' writs of attachment in aid of such execution is accordingly affirmed.

*AFFIRMED*