**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 14-1333**

─────────────

JEFFREY S. HODGES; TOMMY LEE BONDS; JOHN PAUL SPANGLER,

                Plaintiffs – Appellants,

       v.

FEDERAL-MOGUL CORPORATION; Q-TECH EQUIPMENT & SERVICES OF THE CAROLINAS, L.L.C.; CARRINGTON ENGINEERING SALES CO.; CARRINGTON ENGINEERING SALES; DUSTEX CORPORATION; THE KIRK & BLUM MANUFACTURING COMPANY; K&B DUCT,

                Defendants - Appellees,

       and

CARRINGTON ENGINEERING SALES COMPANY, LLC; CECO ENVIRONMENTAL CORPORATION,

                Defendants.

─────────────

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Michael F. Urbanski, District Judge. (7:12-cv-00362-MFU-RSB)

─────────────

Argued: May 12, 2015                Decided: July 8, 2015

─────────────

Before MOTZ, KING, and THACKER, Circuit Judges.

─────────────

Vacated and remanded by unpublished per curiam opinion.

─────────────

**ARGUED:** Edward Kyle McNew, MICHIEHAMLETT, PLLC, Charlottesville, Virginia, for Appellants. Monica Taylor Monday, GENTRY, LOCKE,

RAKES & MOORE LLP, Roanoke, Virginia, for Appellees. **ON BRIEF:** Neal Stanley Johnson, JOHNSON LAW PLC, Roanoke, Virginia; Peter Brent Brown, BROWN & JENNINGS PLC, Roanoke, Virginia, for Appellants. Guy M. Harbert III, James J. O'Keeffe IV, Daniel R. Sullivan, GENTRY LOCKE RAKES & MOORE LLP, Roanoke, Virginia, for Appellee Federal-Mogul Corporation; David Drake Hudgins, HUDGINS LAW FIRM, Alexandria, Virginia, for Appellee Dustex Corporation; Bevin Ray Alexander, Jr., James Barrett Lucy, FREEMAN, DUNN, ALEXANDER, GAY, LUCY & COATES, P.C., Lynchburg, Virginia, for Appellees Q-Tech Equipment & Services of the Carolinas, L.L.C. and Carrington Engineering Sales Co.; Donald Edward Morris, LAW OFFICES OF ANTONY K. JONES, Richmond, Virginia, for Appellees The Kirk & Blum Manufacturing Company and K&B Duct.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jeffrey S. Hodges, Tommy Lee Bonds, and John Paul Spangler (the "plaintiffs") sustained serious injuries on December 31, 2010, from a fire that occurred while they were cleaning aluminum dust from a production facility in Blacksburg, Virginia. The plaintiffs commenced this civil action in the Western District of Virginia on August 6, 2012, seeking to recover damages on claims that defective and unreasonably dangerous safety equipment had caused their injuries. The defendants — including appellees Federal-Mogul Corporation ("Federal-Mogul"); Q-Tech Equipment & Services of the Carolinas, L.L.C. and Carrington Engineering Sales Co. (together, "Carrington"); Dustex Corporation ("Dustex"); and The Kirk & Blum Manufacturing Company and K&B Duct (together, "K&B") (collectively, the "defendants") — played various roles in the design, manufacture, installation, and maintenance of the safety equipment. Following discovery, the defendants moved to exclude the opinions of the plaintiffs' proposed experts under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and for summary judgment.[1] For reasons set forth in its Memorandum

---

[1] When the summary judgment and Daubert motions were filed, two additional named defendants — Carrington Engineering Sales Company, LLC and CECO Environmental Corporation — had already been dismissed. The plaintiffs do not challenge those dismissals.

3

Opinion of March 7, 2014, the district court granted the Daubert motions and awarded summary judgment to the defendants. See Hodges v. Federal-Mogul Corp., No. 7:12-cv-00362 (W.D. Va. Mar. 7, 2014), ECF No. 149 (the "Opinion").[2] In this appeal, the plaintiffs contest solely the summary judgment awards. As explained below, we vacate and remand.

I.

A.

The fire underlying this civil action occurred in a production facility (the "facility") owned and operated by Federal-Mogul in Blacksburg, where it manufactures automotive bearings.[3] In 2002 and 2003, Federal-Mogul added an aluminum bonding line that involved sanding and brushing aluminum and steel strip. A byproduct of those operations is aluminum dust, which is highly combustible. Federal-Mogul installed a dust collection system to safely remove and dispose of the aluminum dust (the "dust collection system"). The dust collection system

---

[2] The district court's unpublished Opinion is found at J.A. 4160-93. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[3] We recite the facts in the light most favorable to the plaintiffs, as the nonmoving parties. See Covol Fuels No. 4, LLC v. Pinnacle Mining Co., LLC, 785 F.3d 104, 106 n.2 (4th Cir. 2015).

utilized fans to capture the dust and transport it through ductwork located along the facility's ceiling. The ductwork extended through an exterior wall, turned at a right angle, and ultimately disposed of the dust in a structure outside the facility that was called a "baghouse." Also connected to the ductwork was a rectangular damper box (the "back-blast damper") that was mounted to the facility's exterior wall. Inside the back-blast damper was a damper door, which was hinged at the top. If the explosive dust in the baghouse ignited, the back-blast damper was supposed to prevent the fire from entering the facility through the ductwork.

In 2010, Federal-Mogul initiated "a dust mitigation effort in its plants worldwide," and hired LCM Corporation ("LCM") to inspect and remediate the Blacksburg facility. See J.A. 116. On December 30, 2010, LCM employees — including plaintiffs Hodges and Bonds — performed an inspection of the facility and discovered that three to five inches of dust had accumulated in the ductwork above the aluminum bonding line. The following day, Hodges and Bonds returned to the facility with plaintiff Spangler to clean that ductwork. Unaware that the dust was combustible, the plaintiffs wore flammable Tyvek suits.

Hodges and Bonds mounted a scissor lift to reach the ductwork, approximately twenty to thirty feet from the ground. They extracted the dust with a vacuum hose connected to a truck

5

located just outside of the facility. Spangler operated the truck, which ran idly and controlled the power of the vacuum hose. After cleaning the portion of the ductwork that faced inside the facility, Hodges and Bonds turned around and began cleaning the portion of the ductwork facing the baghouse. They were then approximately twenty feet from the exterior wall, and Hodges held both a flashlight and the vacuum hose, while Bonds stood behind Hodges and helped him control the hose.

Using the flashlight, Hodges looked into the ductwork, toward the baghouse. He saw several inches of accumulated dust that "kind of varied" in height "and went all the way back out to outside the building." See J.A. 2312. Hodges was able to see into the back-blast damper and past the damper door, which was partially propped open by dust. As Hodges and Bonds cleaned the second section of the ductwork, they had trouble manipulating the hose and reaching the dust, and also felt shocks of static electricity. As a result, Hodges and Bonds duct-taped a PVC extension to the hose to lengthen and stabilize it. In order to reduce the static electricity, Hodges asked Spangler to go outside to the vacuum truck and decrease its power. Spangler obliged and began walking to an exit door that was propped open, heading toward the direction of the baghouse.

At that time, an explosion occurred and fire spread through the ductwork. Hodges saw "a flash of a fireball" emanate from

6

outside the facility beyond the back-blast damper, coming toward him. See J.A. 2312. Spangler, having nearly reached the exit, saw a "bright white light" that "came at [him] from the front." Id. at 2675. The baghouse exploded, and flames spewed out of the ductwork. The Tyvek suits donned by Hodges and Bonds promptly caught fire, as did Spangler's hat. All three plaintiffs sustained serious injuries.

B.

1.

After commencing this civil action in the Western District of Virginia on August 6, 2012, the plaintiffs filed their operative Amended Complaint on December 26, 2012. The Amended Complaint alleges seven causes of action:

- Count I is brought against Federal-Mogul, alleging that the company was negligent in numerous respects, including its role in the design and installation of the dust collection system. In addition, Count I asserts that Federal-Mogul negligently failed to perform routine maintenance on the system.

- Counts II and III are against Carrington, the company that sold and installed the dust collection system to Federal-Mogul. Count II alleges that Carrington breached several warranties by supplying Federal-Mogul with a blast-back damper that was defective and not fit for its particular purpose. Count III raises a negligence claim, asserting that Carrington negligently designed and installed the dust collection system so that the airflow in the system was too weak to prevent dust from accumulating in the ductwork and back-blast damper.

- Counts IV and V allege warranty and negligence claims against Dustex, which designed and

7

manufactured the baghouse. Those counts assert that Dustex designed the baghouse in an unsafe manner, without sufficient venting to prevent an explosion in the baghouse from entering the facility.

- Counts VI and VII name K&B, which designed and manufactured the back-blast damper. Those counts raise warranty and negligence claims, respectively, alleging that the damper door failed to prevent the fire from passing through the back-blast damper and into Federal-Mogul's facility, and that K&B negligently designed the back-blast damper.

Following the completion of discovery, the defendants filed their Daubert motions as well as the summary judgment motions at issue in this appeal. The plaintiffs maintained that the fire originated in the baghouse and travelled through the ductwork and into the facility, passing through the back-blast damper. To show that the fire started outside of the facility and travelled into it, the plaintiffs relied heavily on Hodges's deposition evidence that he personally observed the fireball emanate toward him from outside the facility. That evidence, the plaintiffs maintained, was corroborated by other evidence of record, including, inter alia: Spangler's deposition testimony that he saw a bright flash and felt a blast coming from the direction of the baghouse; surveillance video footage that showed changes in lighting and shadows as the events unfolded; and pictures of the ductwork and the baghouse taken following the fire.

In addition, the plaintiffs relied on their two experts, Patrick McGinley and Martin Schloss, who offered opinions on three issues. First, both opined that the fire was caused by an exothermic reaction (or, a spontaneous combustion) in the baghouse resulting from aluminum dust interacting with condensation (the "causation opinions"). Second, both McGinley and Schloss — relying on Hodges's deposition evidence — opined that the fire originated in the baghouse and then spread through the back-blast damper and into the facility's ductwork (the "origin opinions"). Third, Schloss opined that defects in the dust collection system permitted the fire to enter the facility, thus causing the plaintiffs' injuries (the "defect opinion"). According to Schloss's defect opinion, the baghouse was designed and manufactured with insufficient venting, failing the safety standards established by the National Fire Protection Association (the "NFPA").[4] As a result, if a combustion occurred in the baghouse, the structure could not release the pressure in a controlled manner. The defect opinion further concluded that the back-blast damper was defectively designed and constructed, failing the NFPA standards because it was improperly welded and

_____

[4] The NFPA is a private, professional organization that "among other things, publishes product standards and codes related to fire protection." Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 495 (1988).

9

made from the wrong gauge of steel. As a result, the back-blast damper was unable to withstand the expected pressures.

In support of their summary judgment motions, the defendants pursued several contentions, including that the plaintiffs could not sufficiently prove proximate cause, and that the plaintiffs' contributory negligence barred any recovery. Relevant here, the defendants disputed the plaintiffs' theory of how and where the fire started. Specifically, they maintained that the fire was caused by the static electricity that the plaintiffs encountered when manipulating the vacuum hose in the ductwork. That is, the defendants posited that the fire originated inside the facility and then spread through the ductwork in both directions — to where Hodges and Bonds were standing and also outside to the baghouse, which was destroyed. In that scenario, the dust collection system did not malfunction or contribute in any way to the plaintiffs' injuries.

In arguing that the plaintiffs could not show a genuine dispute of material fact, the defendants maintained that certain of the plaintiffs' evidence should be rejected. To that end, the defendants relied on their Daubert motions to exclude McGinley's and Schloss's opinions. The defendants further asserted that no consideration should be given to Hodges's deposition testimony that the fire began outside of the

10

facility. Hodges had testified that he recalled the damper door being hinged "from the center," allowing him to "see over the top of it from the center up." See J.A. 2373. It is undisputed, however, that the damper door actually hinged at the top, which means that Hodges would have been unable to see "over the top of it." Id. Thus, the defendants urged that Hodges's evidence was necessarily inaccurate. The defendants maintained that, absent their expert opinions or Hodges's evidence, the plaintiffs could not show a genuine dispute of material fact, and thus could not survive summary judgment.

2.

In its March 7, 2014 Opinion, the district court first addressed the Daubert challenges to the causation and origin opinions, finding each set of opinions insufficiently reliable. The causation opinions were rejected because the court found that they were based on nothing more than "conjecture that conditions conducive" to an exothermic reaction were present. See Opinion 11. With respect to the origin opinions, the court observed that both McGinley and Schloss relied heavily on Hodges's deposition testimony, which — as is further explained below — the court deemed to be "physically impossible testimony." Id. at 22. The court concluded that the experts' misplaced reliance on Hodges indicated that the origin opinions were premised on "advocacy" rather than "on scientific

11

methodology." Id. The court failed to address Schloss's defect opinion or directly assess the Daubert motions as they related thereto. The court, however, ruled that "[t]he opinions offered by plaintiffs' experts . . . are . . . inadmissible under Rule 702," excluding the expert opinions in their entirety. Id. at 34.

Next, the district court turned to the summary judgment motions, applying Virginia's substantive law. The court observed that the viability of the plaintiffs' claims depended on whether they could show that the fire originated outside of the facility. See Opinion 26. Assessing the evidence relied on by the plaintiffs, the court first considered Hodges's deposition testimony that he was able to see the fireball enter the facility from beyond the damper door. The court scrutinized his statement that "I could see over the top of [the damper door] from the center up," see J.A. 2373, in light of the parties' agreement that the damper door hinged at the top. The court then determined that Hodges's testimony was "physically impossible," and therefore "does not provide any basis for a jury to do anything but speculate" that the fire began outside of the facility. See Opinion 27. Accordingly, the court discredited Hodges's testimony. Id. (citing Feliciano v. City of Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013)).

12

Turning to the remainder of the plaintiffs' evidence — Spangler's deposition testimony, the surveillance footage, and the post-accident pictures — the district court concluded that none of it provided a nonspeculative basis to find that the fire originated outside of the facility. Overall, the court determined that, "[a]t most, plaintiffs' evidence taken together and viewed in the light most favorable to them, leaves the jury completely at sea as to the cause and origin of the fire and explosion in this case." See Opinion 29. According to the court, the plaintiffs had not satisfied their burden, under Virginia law, to establish their claims "beyond the realm of 'conjecture, guess, or random judgment upon mere supposition.'" Id. at 30 (quoting Chesapeake & O. Ry. Co. v. Whitlow, 51 S.E. 182, 184 (Va. 1905)). Thus, the court determined that the defendants were entitled to summary judgment on each claim alleging design and manufacturing defects in the back-blast damper and baghouse.

Finally, the district court addressed the plaintiffs' sole non-product-defect theory of liability: that Federal-Mogul was negligent by failing to protect the plaintiffs from the known dangers of aluminum dust. The court determined that, as a matter of law, Federal-Mogul acted reasonably in seeking out LCM, an expert in hazardous waste removal, and "in assuming LCM and the plaintiffs, as hazardous waste removal experts, would

13

determine both the substance they were dealing with and the proper method for removing it." See Opinion 33. The court accordingly concluded that Federal-Mogul was entitled to summary judgment on all theories of negligence.

The plaintiffs have timely noticed this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review de novo a district court's award of summary judgment. See Desmond v. PNGI Charles Town Gaming, LLC, 630 F.3d 351, 354 (4th Cir. 2011). In so doing, "we are required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party, in order to determine whether there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Libertarian Party of Va. v. Judd, 718 F.3d 308, 312-13 (4th Cir. 2013) (internal quotation marks omitted). A fact is material if it "'might affect the outcome of the suit under the governing law.'" Henry v. Purnell, 652 F.3d 524, 548 (4th Cir. 2011) (en banc) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

III.

A.

On appeal, the plaintiffs contend that the district court erred in concluding that they had not shown a genuine factual dispute regarding the fire's origin, and thus improperly awarded summary judgment to the defendants. To prevail on their claims, the plaintiffs must establish that the fire originated outside of the facility — only then could the alleged defects in the dust collection system have caused their injuries. See Br. of Appellants 13 ("If [the fire] started inside [the facility], then the Plaintiffs lose."); see also Logan v. Montgomery Ward & Co, Inc., 219 S.E.2d 685, 687-88 (Va. 1975) (explaining that, in product liability actions involving negligence and warranty claims, Virginia law requires plaintiff to show that defendant's breach of duty to plaintiff was proximate cause of plaintiff's injuries). It is undisputed that Hodges's testimony — if credited — could support a reasonable inference that the fire began outside of the facility. It is also undisputed that Hodges's testimony recalling that "it looked like [the damper door] pivoted from the center," allowing him to "see over the top of [the door] from the center up," see J.A. 2373, was not physically possible, as the damper door hinged from the top.

Where a witness's deposition testimony "is blatantly contradicted by the record, so that no reasonable jury could

15

believe it," an alleged factual dispute created by the testimony need not be credited and "will not defeat an otherwise properly supported motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotation marks omitted). On this record, however, we are satisfied that Hodges's evidence regarding the fire's origin was not physically impossible and thus should have been credited for summary judgment purposes.

Importantly, Hodges wavered and qualified his description of the damper door's configuration. Although the district court focused on Hodges's statement that he saw "over the top of" the door, the record reveals that Hodges was actually quite uncertain:

> Q  [Did the damper door have] a hinge at the top?
>
> A  I don't know.  I know that I could see the [damper door] that was in there and to me it looked like it pivoted from the center, but I don't know.
>
> Q  That's what I'm trying to find out.  Where you saw that could you see a gap on the side, the top or the bottom?
>
> A  I could see over the top of it from the center up.
>
> ***
>
> Q  So, [the damper door] looked like to you that it hinged on the top and opened up at the bottom?
>
> A  It hinged.  I don't know for sure if it was the top or the side, but it . . . hinged somewhere inside the pipe.

J.A. 2373, 2391 (emphasis added).  Hodges's testimony was thus inconsistent about where the damper door was hinged.  Viewing

16

the facts in the plaintiffs' favor, Hodges was most assuredly unsure about the damper door's configuration, and his testimony could not be rejected as a matter of law.

Additionally, the record does not blatantly contradict Hodges's testimony that he saw through the propped-open damper door and observed the fire emanate from outside the facility. The damper door was circular in shape and held open by several inches of dust. Openings would have formed from the base of the ductwork and up along both sides of the damper door. Other openings could also have existed underneath the damper door, given that the dust was not uniform in height. Hodges could well have seen through those openings around the damper door. In fact, Hodges described — correctly — a bend in the section of ductwork connecting the back-blast damper to the baghouse, see J.A. 2313, supporting the plaintiffs' position that Hodges could see past the damper door. Given that Hodges was able to view the ductwork past the black-blast damper, he certainly would have been able to observe the bright "flash" of a "fireball" enter into the facility in the dark and dusty ductwork. Id. Therefore, even if Hodges was mistaken in his description of the damper door's configuration, it was not physically impossible for him to have seen the fire emanate from beyond the back-blast damper.

Overall, the issue raised by Hodges's testimony that he saw over the top of the damper door is an issue of credibility, and the district court erred by assessing Hodges's credibility and rejecting his evidence at the summary judgment stage. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment . . . ."). Rather, the inconsistencies and possible errors in Hodges's testimony should be considered and resolved by a jury. See United States v. Harris, 995 F.2d 532, 535 (4th Cir. 1993) ("[J]urors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination."). Viewing the evidence of record in the plaintiffs' favor — as we must — we are satisfied that Hodges's testimony creates a genuine issue of whether the fire originated outside of the facility.[5]

---

[5] Because Hodges's evidence is sufficient to create a genuine issue on whether the fire started outside of the facility, we need not analyze whether Spangler's testimony or the surveillance video would similarly create a genuine issue. The plaintiffs primarily rely on that evidence to corroborate Hodges. See Br. of Appellants 18-19 (arguing that Spangler's (Continued)

18

B.

The next issue is whether, as the defendants argue, the district court's summary judgment awards should be affirmed on an alternative ground. See Hegna v. Islamic Republic of Iran, 376 F.3d 226, 232 n.3 (4th Cir. 2004) (recognizing that we are "entitled to affirm the district court's judgment on [an] alternative ground" that was raised by the parties in the district court and is apparent from the record). More specifically, the defendants assert that, even if the court erred and Hodges's testimony is sufficient to show the fire started outside of the facility, the plaintiffs have not proven a genuine factual issue concerning whether the alleged defects in the dust collection system proximately caused the plaintiffs' injuries.

Notably, the parties dispute whether the district court ruled on proximate cause. The defendants maintain that the court made such a ruling when it concluded that there was "simply no proof of a defect in the baghouse or damper that caused plaintiff's injuries beyond the realm of conjecture, guess, or random judgment upon mere supposition." See Opinion 30 (internal quotation marks omitted). But that statement of

testimony and video evidence "buttress[]" and are "corroborative of Hodges's testimony").

19

the court followed — and was explicitly made "[i]n light of" — its conclusion that the plaintiffs had produced no evidence showing that the fire started outside the facility. See id. at 29.

The Opinion therefore does not assess whether the sum of the plaintiffs' evidence — including Hodges's testimony — could lead a reasonable jury to conclude that any one or more of the defendants proximately caused the plaintiffs' injuries. In these circumstances, we decline to resolve that issue in this appeal, in light of "the general rule . . . that a federal appellate court does not consider an issue not passed upon below." Singleton v. Wulff, 428 U.S. 106, 120 (1976).[6] The proximate cause analysis is highly complex, and given that it was not thoroughly briefed on appeal, the district court is better suited to address that issue in the first instance. See Goldfarb v. Mayor of Balt., __ F.3d __, __ (4th Cir. 2015) ("The

---

[6] We also decline to affirm the summary judgment awards on an alternative ground because of two aspects of the district court's rulings on the Daubert motions. First, the scope of the court's rulings is unclear because it failed to address Schloss's defect opinion. Nevertheless, the court broadly purported to exclude the entirety of the expert opinions. Second, and perhaps more important, the court determined that the origin opinions were unreliable in part because both McGinley and Schloss relied on Hodges's evidence. In light of our conclusion that Hodges's evidence was erroneously discredited and not viewed in the light most favorable to the plaintiffs, the court's exclusion of the origin opinions may well warrant a full reassessment.

20

district court is in a better position to consider the parties' arguments in the first instance, which can be presented at length rather than being discussed in appellate briefs centered on the issues the district court did decide.").

IV.

Pursuant to the foregoing, we vacate the summary judgment awards and remand for such other and further proceedings as may be appropriate.

<u>VACATED AND REMANDED</u>